**UNITED STATES of America,**
**Appellee,**

v.

**Louis RIFKIN, Appellant.**

**No. 109, Docket 71–1411.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 15, 1971.

Decided Nov. 17, 1971.

Louis Bender, New York City (Lloyd A. Hale, New York City of counsel), for appellant.

Elliot G. Sagor, Asst. U. S. Atty., New York City (Whitney North Sey-

mour, Jr., U. S. Atty. for the Southern District of New York, Peter F. Rient, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before FRIENDLY, Chief Judge, CLARK, Associate Justice,* and KAUFMAN, Circuit Judge.

Mr. Justice CLARK:

Appellant stands convicted by a jury on a five-count indictment charging him with attempts to evade payments of substantial portions of his income taxes for the calendar years 1961 through 1963, inclusive, by the filing of false and fraudulent joint income tax returns (Counts one through three); and with the evasion of corporate income taxes of Vim Chemists 134 Inc., of which he was the sole stockholder and president, for the corporate fiscal years ending March 31, 1962 and 1963 (Counts four and five); all in violation of 26 U.S.C. § 7201. Six errors are claimed on this appeal: (1) Insufficient evidence to prove income tax evasion on the theory adopted —*i. e.*, the bank deposits and expenditures method of computation; (2) abuse of grand jury process on the ground that only hearsay testimony was produced before the grand jury; (3) refusal of the trial judge to permit the appellant to counter prosecution evidence that his wife had no safe deposit box at a named bank by presenting as a surrebuttal witness an official of the bank who would testify that a flood had destroyed some of the bank's records as to safe deposit boxholders; (4) failure of the prosecution to produce at pre-trial some notes of the Special Agent covering conversations with appellant's tax counsel as to the facts of the case; (5) error in permitting the jury to continue deliberations after it had advised the

trial judge that one of the jurors had traded at appellant's pharmacy; and (6) colloquy of the trial judge and prosecutor at various times in the case which was prejudicial; and a question of the prosecutor—later stricken—as to a sales tax investigation by the City of New York. We have carefully considered each of the points—as well as the totality of the trial—and have concluded that there is no ground for reversal. The judgment, therefore, is affirmed.

I.

Appellant, a pharmacist, was the sole stockholder and president of Vim Chemists 134 Inc., which operated a pharmacy at No. 2 Broadway in Manhattan from 1960 to 1965.[1] Both appellant's personal income tax returns and the corporation's income tax returns were prepared by an accountant who also prepared the corporation's formal books of account, using daily cash receipts sheets and check book stubs furnished to him monthly.

The Government's investigation of appellant began in December, 1962, as an audit of his 1961 joint return, notice of which was given on February 7, 1963. Appellant's accountant contacted the Internal Revenue Agent, and they met in April, 1963, to conduct the audit. Soon thereafter the Agent began a check of appellant's brokerage account. Tax counsel for appellant then contacted the Agent, and the latter requested him to furnish all records of appellant's income, stock purchases and other financial transactions and sources of funds. On September 27, 1963, the same tax counsel reported to the Agent that the money for appellant's stock purchases, save one that had been financed from his checking and savings account, came from a cash inheritance of some $65,335 from his father. According to the attorney,

---

* United States Supreme Court, retired, sitting by designation.

1. The corporation previously had operated a pharmacy at 134 East 59th Street during which period a Mr. Goldfarb was the sole owner of all of its stock and its president. On moving to Broadway in 1960, Mr. Goldfarb sold the appellant, who was an employee of the pharmacy at the 59th Street location, fifty per cent of the stock of Vim Chemists 134 Inc. Three months after moving to No. 2 Broadway, Mr. Goldfarb sold the remaining shares of Vim Chemists to appellant.

appellant's father had given the cash to appellant in a paper bag in 1957 or 1958. Appellant was to distribute the cash after his father's death—"since he was the most educated one in the family, and the father could trust him, he relied on him to distribute it equally between the balance of the family." Appellant, his counsel continued, kept the money in the bag from 1957 or 1958 until the father's death on May 11, 1961, when he opened it and found $65,335 in cash. At the close of the interview, the appellant's counsel showed the agent a copy of an estate tax return for the father which was filed on September 6, 1963, and pointed out that the amount in Schedule C of the return was the same as the amount in the paper bag.

Appellant's tax file, as well as that of Vim Chemists, was then referred to the Intelligence Division of the IRS, and a Special Agent took over the investigation. The Division uncovered that during the period January 1, 1961 through February 11, 1963, appellant and his wife made 122 deposits in savings and brokerage accounts, and purchased stocks, bonds and an automobile. The stock purchases totalled $65,355.75 and were made by cash, through teller's checks purchased at banks for cash by appellant's wife or employees of Vim Chemists, as well as by personal checks. The employees testified that they often received packages of cash from appellant, standing behind the counter at the pharmacy at the time, with instructions to purchase teller's or cashier's checks at the bank, payable to the name of the person designated on the outside of the packages [a broker], and to return them to appellant. Although appellant's wife testified that she always brought the cash to appellant for the stock purchases from a lock box, the evidence showed that the employees would perform these transactions earlier in the day than when the wife came to the pharmacy. In addition, other teller's checks were purchased by appellant's wife for cash from other banks. The bond purchases totalled $23,342 and were made at nine different banks, some from different banks on the same day. All of the bonds were issued to appellant's wife and himself.

The Government tried the case on a bank deposit and expenditure method of proof and contended that the purchases of stocks and bonds came from cash drained off from the cash receipts of the pharmacy and unreported on either the corporation or the personal tax returns. They estimated that some 16 percent of the pharmacy receipts were involved. During the nearly twenty-six month period in question, appellant's and his wife's deposits and expenditures allegedly exceeded his take-home pay as reported on their joint returns by $87,578.

Appellant's wife testified that she purchased the bonds at various times from funds given to her by her mother before her mother's death in 1950. She claimed these gifts were in cash, one being for $10,000 and others ranging from $50 to $1500, all of which she put in a lock box. She also received the balance of a bank account of her mother's which was in the amount of $2709.20.

Appellant's wife also testified about the "cash hoard." She said that after appellant's father died in 1961, he took his father's metal box from his father's apartment. At their home appellant opened the box and took out a paper sack containing money. He counted it —$65,355 in twenties, fifties and hundreds—and told her to put it in the lock box which she did the next day.

Appellant's sister, Helen, also testified about the cash hoard. She said that her father had a metal box which he kept in his closet and in which he kept large sums of money and family papers; that she had seen a paper bag—a grocery kind of bag—in which he kept the money; that at a family gathering before his death, her father told the family that everything in the box was to go to appellant, except some personal effects of the family; and that after her father's death, she saw appellant and his wife leave with the metal box.

The Government's evidence showed that the bond and stock purchases began a short time after appellant became the sole owner of the pharmacy and that they continued regularly, though intermittently, until the notice of tax audit of February 7, 1963; that the purchases then tapered off to a few isolated transactions; that there was a discrepancy in the statements made by the appellant's tax counsel to the Revenue Agent and the testimony at trial of other witnesses, especially about the time appellant had received the cash from his father; that the $2709.20 balance appellant's wife received from her mother's bank account was the approximate cost of three stock issues that were purchased in her name about a year later; that all the remaining stock was in the appellant's name; that the appellant's wife had also purchased $23,342 of bonds which was more than the cash she had received from her mother; that $22,000 of the stock purchased by appellant was bought before the death of the father and prior to the date when appellant's wife and sister testified that the cash hoard was delivered. In addition, the Government has checked the Social Security earnings record of appellant's father, discovering that in only two of the twenty-three years, 1937 through 1960, inclusive, had the father earned as much as $3000. His total wages during the whole period were only $30,000.

## II.

■■ Appellant's chief contention is that the trial court should have granted his motion for acquittal at the close of the government's case on the grounds that the prosecution did not investigate leads as to the sources of the funds appellant deposited and expended. We hold that the motion for acquittal was properly denied. Assuming, without deciding, that in a case of this type[2] it is necessary for the Government to investigate "leads" where the information is even more readily available to the defendant, the Special Agent did investigate all leads which had any substance. For example, in response to the $65,335 inheritance claim, he determined that the father earned only $30,000 over 23 years, that no estate had been administered and that no New York State estate tax return had been filed. He also checked into the bank account which had been left to Mrs. Rifkin, as well as Mrs. Rifkin's alleged lock box. See United States v. Nunan, 236 F.2d 576, 586 (2d Cir. 1956), cert. denied, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957); Buttermore v. United States, 180 F.2d 853, 855 (6th Cir. 1950). While self-employed income was not directly negated, the charge of the court cured any defect in this regard.

■ Appellant insists that there is no direct evidence that any cash was taken from the pharmacy receipts and invested in the stocks and bonds. This is true, but there was more than sufficient circumstantial proof to support the jury's determination in this regard under clearly proper instructions. The jury also rejected appellant's claim that the pharmacy could not stand such a financial drain without bankruptcy.

■ Nor is there any substance to the contention that the prosecutor destroyed his case when he admitted that appellant may have received some money from his father. This is somewhat of an exaggeration of the prosecutor's statement in his summation that the father may have had "ordinary cash that any of us keep around the house."

■ The appellant's second argument on appeal is that the trial court should have dismissed the indictment on the

---

2. In a tax evasion prosecution based on the "net worth and expenditure method," the government must effectively negate "reasonable explanations by the taxpayer inconsistent with guilt" and follow-up those leads which are "reasonably suscept-ible of being checked, [and] which, if true, would establish the taxpayer's innocence." Holland v. United States, 348 U.S. 121, 135–136, 75 S.Ct. 127, 135, 99 L. Ed. 150 (1954).

grounds that the evidence before the grand jury was solely hearsay testimony. In United States v. Leibowitz, 420 F.2d 39, 42 (2d Cir. 1969), we stated that dismissal of the indictment might be considered

> [i]f the grand jury is misled into thinking it is getting eye-witness testimony from the agent whereas it is actually being given an account whose hearsay nature is concealed * * * [or] if the defendant could show that there is a high probability that with eye-witness rather than hearsay testimony the grand jury would not have indicted. .

Here the Special Agent appearing before the grand jury explained the sources of his testimony, and the appellant has not put forward any evidence which, if introduced, would create a probability, high or otherwise, that the grand jury would not have indicted if eyewitnesses had been summoned.

■ Appellant's third contention is that it was error for the trial court to refuse to hear testimony, on the last day of the trial, from an employee of the Boro branch of the Manufacturer's Trust Company. Appellant claims that this witness, only recently located, would have testified that the branch had suffered a flood which destroyed many records on previous safe deposit box holders. In this manner, appellant contends, he might have demonstrated that his wife had a safe deposit box at the Boro branch, even though existing records did not indicate this. In light of the fact, however, that Mrs. Rifkin had testified on the previous day that she was "pretty certain" that her alleged safe deposit box was in the Bay Ridge Savings Bank, it is clear that appellant exaggerates the probative effect of this refused testimony. Although it might have been better to allow the witness to testify, especially in light of the offer of the defense counsel to have the time required for such testimony to be deducted from that allowed for his summation, we find no prejudicial error in the trial court's ruling on this point.

■ Appellant also complains of the admission in evidence of a conversation between the Internal Revenue Agent and appellant's tax attorney. He says that the Government's failure to turn over the notes of the conversation pursuant to a pre-trial request precluded its admission. We think not. The discovery request did not include statements by tax counsel, but was limited to those of the appellant. Nor could the appellant be surprised or disadvantaged since the defense must have been well aware of the statement and did not ask for a continuance or otherwise indicate surprise. Indeed, the tax counsel had been active in the case and was attending court. Moreover, his statements were basically in agreement with appellant's own pre-trial ones. Finally, the trial judge has wide discretion in this area, and we cannot say that he abused it here. See 8 Moore's Federal Practice § 16.04 [3].

■■ We need not pause long to discuss the remaining points raised by appellant. Obviously, the juror who indicated to the jury during its deliberations that he had made purchases at the pharmacy was not disqualified by such happenstance. Mikus v. United States, 433 F.2d 719, 723–724 (2d Cir. 1970). The mere fact of purchases alone shows no bias. See United States v. Haynes, 398 F.2d 980, 984 (2d Cir. 1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 996, 22 L. Ed.2d 124 (1969). Moreover in the light of the trial judge's strong admonitions to the jury, we see no error. We note also that appellant made no objection whatever until his motion for new trial after conviction. We cannot, at this late date, say that a new trial is required. See United States v. Porth, 426 F.2d 519 (10th Cir.), cert. denied, 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1970); Little v. United States, 331 F. 2d 287 (8th Cir.), cert. denied, 379 U.S. 834, 85 S.Ct. 68, 13 L.Ed.2d 42 (1964). The claimed error as to the prosecutor's inquiry with regard to the city's investigation of the payment of sales taxes was not only never answered, but the question itself was stricken, and the jury in-

structed to disregard it. The appellant also disagrees with some of the trial judge's statements during the trial. As we read the record, the judge was dispassionate and alert to the appellant's rights and was eminently fair in his appraisal of the contentions of the parties. Since we find no error, the judgment is affirmed.