**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William L. HART, Defendant–Appellant.**

No. 92–2144.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 23, 1995.

Decided Nov. 16, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 3, 1996.

Jennifer J. Peregord (argued and briefed), Alan M. Gershel, Office of U.S. Attorney, Detroit, MI, for Plaintiff-Appellee.

Arthur Jay Weiss (argued and briefed), Law Offices of Arthur Jay Weiss & Associates, Farmington Hills, MI, for Defendant-Appellant.

Before: JONES, CONTIE, and MILBURN, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

In one of the saddest, yet most egregious cases of public corruption to come before this court in recent years, Defendant–Appellant William L. Hart, the former Chief of Police for the City of Detroit, appeals his conviction for embezzlement and filing false income tax returns. Upon careful consideration of the record before this court and the oral arguments, we conclude that appellant's arguments are without merit. Accordingly, we affirm the conviction and sentence in their entirety.

## I.

Many of the facts relevant to this case are set out in two previously published opinions of the district court, *United States v. Hart,* 779 F.Supp. 883 (E.D.Mich.1991), and *United States v. Hart,* 803 F.Supp. 53 (E.D.Mich. 1992), and need not be recounted at length. By way of background, however, William Hart joined the Detroit Police Department ("DPD") as an officer in 1952, and over a twenty-four year period, worked his way up through the ranks of the DPD. In 1976, Hart was appointed to the position of Chief of Police, a post held until February 1991, when he was suspended as a result of the instant offense. Hart's annual salary as Chief of Police was $95,000.

As Chief of Police, Hart administered the DPD's "Secret Service Fund" (the "SSF")—a pool of money that was disbursed at the discretion of the Chief, with little departmental oversight, for the purposes of covert police operations. The SSF operated as a revolving fund. The City Finance Department set a maximum balance for the SSF, and as the balance was depleted, the DPD requested reimbursement in order to bring the SSF back up to its maximum balance. Hart usually made these requests, and the Finance Department issued checks to replenish the SSF. The DPD was required to maintain invoices, receipts, and other documentation of its SSF expenditures.

In July 1982, Hart ordered William Dwyer, the commander of the Chief's Staff Division, to establish a cash fund to finance a covert operation designated as "82–1." Hart revealed the nature of covert operation 82–1 to no one, and during his custodianship of the Fund from July 1982 through 1989, Hart approved a total of ninety-eight fraudulent checks made payable to cash and drawn on the SSF primary account. After Hart signed the checks, a staff member, usually Joe Gilliam, cashed the checks and gave the money

to Dwyer, who then gave the cash to Hart. If Hart was not available, Dwyer would secure the cash in his office until Hart was available. Dwyer continued this practice until he left the DPD in 1984.

After Dwyer left, Hart stopped submitting written requests for the SSF checks, and he began to make verbal requests for money from the SSF. Hart also discontinued the practice of providing written documentation for expenditures of SSF money. Meanwhile, the proceeds of these checks continued to go directly to Hart. During the period from 1982–89, Hart received and/or controlled cash in the amount of $1,292,542.

During a joint investigation of Hart by the FBI and IRS, Hart gave the investigating agents various false and contradictory explanations for the expenditures. Hart also provided the agents with a list of several "investigations" that he claimed received money from the 82–1 fund. Hart refused, however, to disclose either the amount of money that was channelled to these alleged investigations or to whom the money was transferred. Hart also refused an audit by the Auditor General. Eventually, the agents learned that many of the investigations included on Hart's list either required no funding or were funded by other divisions, and that of the $1,292,542 in the 82–1 fund, only $237,136 had been used for legitimate law enforcement purposes.

The other primary member of the conspiracy alleged to have profited from Hart's embezzlement scheme was Kenneth Weiner, a former Deputy Chief in the DPD. Hart and Weiner were friends before Weiner was appointed to the DPD, and during the time they served together at the DPD, Hart main-

tained close working and social relationships with Weiner.[1] Weiner ran several bogus corporations to which Hart funneled $1,292,305 from the SSF. The government's investigation revealed that the SSF funds forwarded to Weiner's entities supported no legitimate law enforcement operations and that these funds were converted for Hart's and Weiner's personal use. Hart, however, claimed that he believed Weiner subcontracted for various security projects, and during the course of his trial, Hart unsuccessfully attempted to introduce evidence that Weiner was a skilled con-man who had successfully deceived government agents on numerous occasions.

Federal agents prepared a financial profile of Hart for the years of 1971–1984. This profile showed that from 1971–1981, Hart's income did not exceed his expenditures, but from 1982—the year the 82–1 covert fund was created—through 1984, Hart's provable expenditures exceeded his income by $210,000. Hart reported none of the SSF money as income on his tax returns from 1982–1989.

During the time of Hart's embezzlement scheme, several units in the DPD experienced serious financial difficulties, as a result of their inability to obtain reimbursement from the SSF for their sub-accounts. For instance, during 1987, the year in which Hart embezzled the most money, lack of reimbursement hindered operations in the Internal Affairs and Organized Crime Sections. In 1986 and 1987, officers in the Narcotics Division were forced to use their own money for drug buys. In fact, the checks to Weiner were such a drain on the SSF that in April 1987, the SSF actually went into overdraft status when Weiner cashed a check too soon. To correct this problem, Weiner promptly

1. During Weiner's tenure as Deputy Chief, he often met with Hart, without appointment, unlike other deputy chiefs. Weiner arranged and paid for the installation of an intercom system and a safe at the Hart residence. Weiner was also a frequent visitor to Hart's home, despite Hart's knowledge that Weiner was under investigation for defrauding hundreds of investors in a "Ponzi" scheme for which Weiner was subsequently prosecuted, convicted, and sentenced to ten years imprisonment. *See United States v. Weiner*, 755 F.Supp. 748 (E.D.Mich. 1991) *aff'd*, 988 F.2d 629 (6th Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 142, 126 L.Ed.2d 105 (1993). In addition,

Hart's advisors warned him that Weiner was "slick" and not to be trusted. Nonetheless, in 1985 and early 1986, Hart believed that Weiner had secured for him a lucrative employment contract with the Sony Corporation to commence after Hart's retirement from the police force. The contract provided well over $2,000,000.00 during a ten year period, with an unlimited budget for housing, two luxury cars, and a chauffeur for Hart's wife. This contract, as well as a similar contract for Robin Bangs, Hart's son-in-law, later proved to be fraudulent, but Hart never sought to enforce the contract with Sony. Presentence Report at ¶ 21.

wired $7,000.00 to the DPD from one of his bogus corporations.

On June 17, 1991, Hart was indicted and charged with three counts of embezzlement, one count of tampering with a witness, and three counts of tax fraud.[2] Following a three-and-a-half month trial, the jury convicted Hart of two counts of embezzlement and two counts of tax fraud. Hart was subsequently sentenced to a ten-year term of imprisonment and ordered to pay restitution in the amount of $2,347,710.90.

## II.

### A.

We first address Hart's argument that he should have been permitted to examine testifying government agents on the issue of Kenneth Weiner's alleged "cons" of the United States Attorney's Office, the FBI, and the IRS in an unrelated criminal matter. As part of his defense, Hart maintained that Kenneth Weiner had conned him into believing that the cash payments to Weiner's companies were being used for legitimate law enforcement purposes. During cross-examination of FBI Agent Justin Fox, the defense attempted to elicit testimony that Weiner had misled government agents on a previous occasion. The government objected, and following an evidentiary hearing, the district court prohibited this line of questioning on three grounds. First the court ruled that, under Federal Rule of Evidence 404(a),[3] such questions were impermissible character evidence; second, the court found that under Federal Rule of Evidence 401,[4] Weiner's al-

leged ability to mislead government agents in an unrelated criminal matter was irrelevant to Hart's prosecution; and third, the court ruled that even if the evidence were relevant, its introduction would be substantially more prejudicial than probative under Federal Rule of Evidence 403.[5] See J.A. at 374–400.

■ On appeal, Hart argues that the exclusion of this evidence denied him his right to present a defense. As we have noted in numerous prior decisions, "a trial judge has broad discretion on evidentiary rulings, because this type of decision turns upon the evidence as developed during the course of a trial." *United States v. Todd*, 920 F.2d 399, 403 (6th Cir.1990). This deferential standard of review applies to a district court's determinations of the relevance of evidence under Rule 401, *see United States v. Hawkins*, 969 F.2d 169, 174 (6th Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1021, 122 L.Ed.2d 168 (1993), as well as determinations under Rule 403 that the prejudicial value of evidence outweighs its probative value. *See United States v. Ushery*, 968 F.2d 575, 580 (6th Cir.), *cert. denied*, 506 U.S. 946, 113 S.Ct. 392, 121 L.Ed.2d 301 (1992); *United States v. Dabish*, 708 F.2d 240, 243 (6th Cir.1983). Because the district court observes the trial first hand, it is in "the best position to assess the impact of the testimony within the context of the proceedings." *Ushery*, 968 F.2d at 580.

■ We find that the district court properly exercised its discretion by refusing to allow the defense to question government agents regarding misleading statements that Weiner made in an unrelated case. First,

**2.** The seven count superseding indictment charged Hart with the following offenses: Count 1—conspiracy to embezzle or wrongfully convert public funds in violation of 18 U.S.C. § 371; Count 2—embezzlement/wrongful conversion of public funds in violation of 18 U.S.C. § 666; Count 3—embezzlement/theft of public funds in violation of 18 U.S.C § 666; Count 4—obstruction of justice by tampering with a witness in violation of 18 U.S.C. § 1512(b)(1); and Counts 5 through 7—making and subscribing false income tax returns in violation of 26 U.S.C. § 7206(1).

**3.** Rule 404(a) provides that, subject to certain exceptions not applicable here, "[e]vidence of a person's character or a trait of character is not

admissible for the purposes of proving action in conformity therewith on a particular occasion." Fed.R.Evid. 404(a).

**4.** Rule 401 provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.

**5.** Rule 403 provides in relevant part, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403.

the district court properly found that evidence of Weiner's alleged prior deceptions of FBI and IRS agents was inadmissible character evidence. Hart's claim was that Weiner's past success in conning federal agents made it more likely that he would have succeeded in conning Hart in the instant case. This amounts to no more than an attempt to establish that Weiner possessed a deceptive character and to demonstrate that he acted in conformity with this character trait in his dealings with Hart. Federal Rule of Evidence 404 prohibits the introduction of character evidence to show action in conformity therewith, except in three limited circumstances. Fed.R.Evid. 404. As Weiner was neither the accused, a victim, nor a witness in this case, none of the Rule 404(b) exceptions would permit the introduction the proffered character evidence.

■ Similarly, Hart has failed to establish that Weiner's alleged prior deceptions are relevant to the present case. Rule 401 preserves the common law requirement for admissibility of evidence that "proffered evidence must be relevant to prove a proposition that is itself 'of consequence to the determination of the action,'" *i.e.*, relevant to prove a proposition that is material to the instant case. *United States v. Fountain*, 2 F.3d 656, 667 n. 6 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 608, 126 L.Ed.2d 573 (1993). The district court concluded that the circumstances surrounding Weiner's past cons differed remarkably from the circumstances in the present case. Weiner's alleged past cons occurred in the context of a criminal investigation. Apparently, in an apparent attempt to obtain more lenient treatment, Weiner misled the agents who were investigating fraud charges against him. In this case, Hart alleged that in the context of their business relationship, Weiner deceived him concerning the use of SSF money for legitimate law enforcement purposes. We conclude that the district court did not abuse its discretion by determining that Weiner's

actions in an unrelated, past criminal proceeding are not probative of whether Hart believed Weiner was applying SSF funds towards legitimate law enforcement purposes.

■ Finally, even if the testimony were relevant, Hart has failed to address the lower court's finding that the evidence's prejudicial value outweighed its probative value. Based on our review of the trial record, we find no abuse of the district court's discretion in this regard. An abuse of discretion occurs only when the district court "relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 30 (6th Cir.1988). As none of these factors has been met, we will not disturb the district court's decision not to allow the defense to pursue a line of questioning which was irrelevant and immaterial to this case.[6]

## B.

■ Hart argues next that Counts Two and Three of the indictment against him were multiplicitous. "Generally, an indictment may not charge a single criminal offense in several counts without offending the rule against 'multiplicity'" and implicating the double jeopardy clause. *United States v. Busacca*, 936 F.2d 232, 239 (6th Cir.), *cert. denied,* 502 U.S. 985, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991). Here, Hart contends that the alleged acts which served as the basis for Count Two (embezzlement/theft) were essentially the same actions that served as the basis for Count Three (embezzlement/wrongful conversion) because "[b]oth allegations pertain to the same criminal statute—18 U.S.C. § 666—and both have similar temporal limitations." Hart's Br. at 26.

■ Though we doubt the merit of Hart's multiplicity claim, we decline to reach this issue, as Hart failed to raise it in a timely manner. Hart failed to raise this claim in

6. Hart also argues that the evidence should have been admitted under either the doctrine of "completeness" (permitting the whole of a written or recorded statement by an adverse party to counter misinterpretations which could result from partial admission) or the doctrine of "curative admissibility" (permitting a trial judge the discretion to admit otherwise inadmissible evidence in order to rebut prejudicial evidence that was erroneously admitted). Clearly, neither doctrine applies to this case.

any of his ten pre-trial motions. In fact, Hart raised this issue for the first time in his Brief in Support of Defendant's Motion for Judgment of Acquittal, following the completion of the government's case. *See* J.A. 62–63. As this issue was not raised prior to trial, we find that Hart waived this issue. *See* Fed.R.Crim.P. 12(b)(2) (Defenses and objections based on defects in the indictment must be raised prior to trial.); *United States v. Colbert,* 977 F.2d 203, 208 (6th Cir.1992) (failure to object to indictment on multiplicity grounds prior to trial constitutes a waiver).

### C.

▮ Prior to trial, Hart filed a motion for a comprehensive bill of particulars with respect to the three tax counts. The district court denied this motion, but instructed the government to specify its "theory of proof" as to those counts.[7] The United States Attorney responded that the government's theory was an "expenditure analysis theory," which is an "indirect" method of proving unreported income.[8] J.A. at 341, 344. The United States Attorney also assured the court that the IRS's calculations of Hart's undeclared income would be made available to the defense along with evidence concerning Hart's expenditures. J.A. at 340. Hart now argues that he was prejudiced by the government's subsequent reliance on a "specific item" method. Specifically, the government introduced evidence of particular SSF funds that Hart embezzled but failed to report on his income tax returns. Hart now claims that the introduction of this evidence created a "fatal variance" between the government's asserted pre-trial method of proof and the proof at trial.

▮ When a Defendant argues a "fatal" or "material" variance, he must demonstrate that the variance prejudiced "substantial rights" and that the variance took the

Defendant by surprise or placed him at risk of double jeopardy. *See Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630–631, 79 L.Ed. 1314 (1935); *United States v. Robinson,* 974 F.2d 575, 578 (5th Cir.1992); *United States v. Horton,* 526 F.2d 884, 887 (5th Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976). "In contrast, a variance is immaterial if it does not impair the defendant's ability to defend himself through failing to identify the nature of the charge." *Robinson* 974 F.2d at 578 (quotation and citations omitted).

Hart argues that he was prejudiced by the evidence presented in support of the government's expenditure theory. He claims that the government proved that his expenditures exceeded his income for the years 1985–87 by introducing " 'explosive' and highly prejudicial proofs indicating Mr. Hart engaged in several extramarital intimate sexual relationships, gambled, and purportedly purchased vast quantities of lottery tickets." Hart's Br. at 33 (citations omitted). According to Hart, this evidence would have been unnecessary and inadmissible if the government had used only a specific-item method of proof.

▮ The use of multiple corroborative methods of proof is common in tax prosecutions and does not constitute a variance. *See United States v. Black,* 843 F.2d 1456, 1460–61 (D.C.Cir.1988) (holding that prosecutor's and district court's misstatements regarding "personal expenditures" method of proof was not reversible error where government identified specific items of unreported income); *Horton,* 526 F.2d at 886–87 (no variance where government designated "specific items" method of proof in response to request for bill of particulars but introduced evidence of bank deposits as corroboration); *United States v. McGuire,* 347 F.2d 99, 101 (6th Cir.) (same), *cert. denied,* 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965).

---

7. The denial of the motion for a bill of particulars was not appealed.

8. There are two methods of proof in a tax case. In the "direct" or "specific item" method, specific items are demonstrated as the source of unreported income. In the "indirect" method, the defendant's finances are reconstructed via circumstantial evidence including (1) net worth

analysis; (2) bank deposits; and (3) cash expenditures in excess of reported income. The safeguards required for indirect methods of proof, such as the establishment of an accurate opening net worth, are not necessary when the government utilizes a specific item method. *See generally United States v. Black,* 843 F.2d 1456 (D.C.Cir.1988).

Moreover, even if Hart could demonstrate that a variance had occurred, he was not prejudiced such that he could demonstrate the variance to be "fatal" or "material." Hart was not unaware of the charges against him; he knew from the onset of this case that the government sought to prove he had embezzled SSF funds and failed to report this money as income. It is clear from the record that Hart denied taking the money and initially argued that the money was indeed used for legitimate law enforcement purposes. Hart could, therefore, have anticipated that the government would dispute this by presenting evidence that money beyond his reported income was used for other identifiable, illegitimate causes. Finally, Hart has not supported his claim that evidence regarding his personal conduct was "explosive" or prejudicial, nor did he object at trial or appeal on these grounds. We therefore conclude that no fatal variance occurred.

### D.

Hart's final claim with respect to his conviction is that Assistant Wayne County Prosecutor Patrick Foley should not have been permitted to serve as a Special United States Attorney during this prosecution. Upon reviewing the record of the proceedings below, we conclude that Foley was properly permitted to participate in the prosecution of this case, and Hart was in no way prejudiced. We find Judge Gadola's opinion to be compelling with respect to its analysis of Foley's participation, and accordingly, we affirm on the grounds stated therein. *See United States v. Hart*, 779 F.Supp. at 887–96.

### E.

Next, we must determine whether the district court improperly sentenced Hart. Hart raises two challenges to his sentence. First, he claims that the district court improperly made an upward departure based on various aggravating factors. Second, he argues that the district court's $2,347,710.90 restitutionary order was excessive.

This circuit has held that an upward departure from the guidelines should be rare. *United States v. Feinman*, 930 F.2d 495, 501 (6th Cir.1991). We apply a three-part test to determine whether an upward departure is appropriate: (1) whether the case is sufficiently unusual to warrant departure; (2) whether the circumstances warranting departure actually exist in the particular case; and (3) whether the departure is reasonable. *United States v. Rodriguez*, 882 F.2d 1059, 1067 (6th Cir.1989), *cert. denied*, 493 U.S. 1084, 110 S.Ct. 1144, 107 L.Ed.2d 1048 (1990); *see also United States v. Bennett*, 975 F.2d 305 (6th Cir.1992). We review the district court's application of the first part of the test *de novo*, the second for "clear error," and the third for abuse of discretion. *United States v. Belanger*, 892 F.2d 473 (6th Cir.1989).

The district court's findings of fact for sentencing purposes are set forth in great detail in *United States v. Hart*, 803 F.Supp. at 55–70. Hart's adjusted offense level was 24, calculated using a base offense level of 4, a fourteen-level adjustment for a loss of over $1.5 million, a two-level increase for more than minimal planning, a two-level increase for abuse of position of trust, and two additional levels for obstruction of justice. The adjusted offense level of 24 yielded a guideline range of fifty-one to sixty-three months.

The district court concluded that five factors were present, any one of which justified an upward departure from the sentencing range under the guidelines. The court first noted "the extreme duration and repetitive nature of these offenses." *Hart*, 803 F.Supp. at 69. Second, the court found that Hart had violated "his unique responsibilities to the public as Chief of the Detroit Police Department" and that he betrayed the public. *Id.* The court identified "the flagrant and devious efforts which he made to conceal his crimes." *Id.* Fourth the court noted "the loss of confidence in the Detroit Police Department which he caused by his shameful and shocking misconduct." *Id.* Finally, the court found that Hart's "misapplication of millions of dollars of funds of the City of Detroit which were to be used to combat crime" had caused "egregious and intolerable harm." *Id.* Accordingly, the district court made an upward departure to the maximum

sentence of ten years incarceration under 18 U.S.C. § 666.

When a sentencing court states multiple reasons for an upward departure, this court should affirm if it is satisfied that any one of the factors would justify the departure. *See Williams v. United States*, 503 U.S. 193, 201–05, 112 S.Ct. 1112, 1120–21, 117 L.Ed.2d 341 (1992) ("A sentence ... can be 'reasonable' even if some of the reasons given by the district court to justify the departure from the presumptive guidelines range are invalid, provided that the remaining reasons are sufficient to justify the magnitude of the departure.").

After reviewing the record before us, we find that the upward departure was reasonable in light of the unusual nature of this case. Hart was the Chief of Police for the sixth largest police department in the country. Over a seven year period, he was responsible for the theft and wrongful conversion of over $2.3 million in department funds. This diversion of resources interfered with the police department's ability to prevent, investigate, and prosecute criminal activities. As previously stated, the government presented testimony that during the course of Hart's scheme, the Internal Affairs, Narcotics, and Organized Crime Units of the DPD experienced significant problems obtaining reimbursement from the SSF to fund their operations.

Hart's employment position, his level of responsibility and trust, and the extensive harms that resulted from his actions are, in our estimation, unusual factors that justify an upward departure. *See United States v. Heckman*, 30 F.3d 738, 742–43 (6th Cir.1994) (upward departure upheld where defendant's conduct of impeding the IRS in the collection of taxes from other taxpayers was not sufficiently contemplated by guideline applicable to crime of filing false documents with IRS); *United States v. Benskin*, 926 F.2d 562, 565–67 (6th Cir.1991) (upward departure upheld based on the fact that defendant's insurance scheme defrauded over 600 investors out of $3.8 million over a 4 1/2 year period); *United States v. Fousek*, 912 F.2d 979, 980–81 (8th Cir.1990) (per curiam) (upward departure upheld for bankruptcy trustee convicted of embezzling estate funds due to the inevitable loss of confidence in the bankruptcy trustee system).

We further find that the degree of the departure from the guidelines range was not an abuse of discretion. In *Heckman*, this court held that "[t]he mere fact that a departure sentence exceeds by several times the maximum recommended under the guidelines is of no independent consequence in determining whether the sentence is reasonable." 30 F.3d at 742 (citations omitted). "[U]nless there is little or no basis for the trial court's action in departing, it must be upheld, provided the trial court has recognized that departure is the exception, and has adequately articulated its reasons for departure." *Id.*

In this case, the district court both recognized that departures are appropriate only in exceptional circumstances and articulated five independent grounds that warranted an upward departure. *Hart*, 803 F.Supp. at 67. The court further stated that:

The dismal, monstrous and intolerable consequences of the defendant's outrageous and heinous misconduct in the embezzlement of funds which had been dedicated by the people's elected representatives to the war against crime and criminals cannot be overestimated.

Those consequences, under the circumstances here presented, are so cruel and hurtful to the residents of this community that they alone warrant an upward departure in the sentence.

*Id.* at 69.

The ten year sentence imposed on Hart was roughly twice the maximum sixty-three month sentence prescribed under the guidelines. Ten years is the maximum sentence permitted under 18 U.S.C. § 666 and is reasonable under the circumstances of the case.

Finally, we address Hart's claim that the amount of restitution the district court ordered him to pay to the City of Detroit was excessive. A challenge to the amount of restitution ordered is reviewed for abuse of discretion. *United States v. Guardino*, 972 F.2d 682, 686 (6th Cir.1992).

The district court ordered Hart to pay restitution in the amount of $2,347,710.90. Pursuant to the Victim and Witness Protection Act, 18 U.S.C. §§ 3663–3664 (the "VWPA"), a sentencing court "may order, in addition to ... any other penalty authorized by law, that the defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a). In determining whether to order restitution and the appropriate amount of restitution, the sentencing court "shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. 3664(a). The statute also provides that the court may direct the probation service to set forth in a presentence report findings with respect to victim impact and the defendant's financial resources. 18 U.S.C. 3664(b).

The government bears the burden of establishing the amount of loss to the victims, who in this case are the people of the City of Detroit. "Any dispute as to the proper amount ... of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(d). Courts have recognized that, in cases such as this, it is more difficult for the government to determine the precise amount of losses.

> The law cannot be blind to the fact that criminals rarely keep detailed records of their lawless dealings, totalling up every column and accounting for every misbegotten dollar.... So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude the trial court from ordering restitution.

*United States v. Savoie,* 985 F.2d 612, 617 (1st Cir.1993).

Pursuant to the VWPA, the district court ordered a presentence report ("PSR"). The PSR contained detailed findings with respect to Hart's financial condition, his assets, and his debts. Presentence Report at ¶ 45. The PSR found that Hart had a net worth of $161,933.00, but that once his tax liability was factored in, his net worth was negative. Yet, in addition to the assets noted in the PSR, the district court determined that Hart is entitled $118,590.34 in accrued sick and vacation pay, $66,400.44 per year in pension benefits, and $675.00 per month in income from rental properties. Thus, the court determined that despite his negative net worth, Hart had significant income from which to pay restitution.

The PSR also found that the City of Detroit suffered a loss of $2,347,710.59. Although not explicitly stated in the PSR, this amount apparently represents the sum of the amounts Hart embezzled by virtue of the checks to Weiner's entities and the checks made to cash for which no legitimate law enforcement purposes were served. As these findings are not clearly erroneous, the district court's restitution judgment is not an abuse of discretion and is therefore affirmed.

### III.

For the foregoing reasons, we AFFIRM Hart's conviction and sentence.