UNITED STATES of America, Plaintiff,

v.

William L. HART, Defendant.

No. 91–CR–80136–DT.

United States District Court,
E.D. Michigan, S.D.

Aug. 27, 1992.

**55**

Stephen J. Markman, U.S. Atty. by Alan Gershel, Craig Weier, Patrick Foley, Detroit, Mich., for plaintiff.

Thomas W. Cranmer, Miro, Miro & Weiner, Bloomfield Hills, Mich., for defendant.

## THE COURT'S OPINION RE: DEPARTURE FROM THE SENTENCE RANGE UNDER THE SENTENCING GUIDELINES

GADOLA, District Judge.

The defendant, William L. Hart, had a tenure of almost 40 years in the Detroit Police Department, culminating in his appointment as Chief of Police by Mayor Coleman A. Young on September 28, 1976, a position which he continued to hold until he was indicted in this matter. He subsequently resigned from the police department immediately following his conviction herein on May 7, 1992.

The defendant was convicted by jury verdicts of the following charges:

*Count Two:* Embezzlement, Wrongful Conversion, or Intentional Misapplication of City of Detroit Funds. 18 U.S.C. § 666.

*Count Three:* Embezzlement, Wrongful Conversion, or Intentional Misapplication of City of Detroit Funds. 18 U.S.C. § 666.

*Count Six:* Making and Subscribing a False U.S. Individual Income Tax Return for the Calendar Year 1986. 26 U.S.C. § 7206(1).

*Count Seven:* Making and Subscribing a False U.S. Individual Income Tax Return for the Calendar Year 1987. 26 U.S.C. § 7206(1).

The verdicts followed a trial which commenced January 21, 1992 and which was preceded by five days of selection of jurors, commencing January 6, 1992.

The Probation Department has concluded that the sentencing guidelines in this case indicate a sentencing range of 51 to 63 months, and the court, following a hearing on the defendant's 37 objections to the Presentence Report herein, has concluded that the sentencing range under the sentencing guidelines is indeed 51 to 63 months.

Defense counsel has requested a departure downward from the sentencing range under the guidelines, and has proposed that the defendant be given "a probationary sentence, coupled with a significant number of hours of community service." Defendant's Sentencing Memorandum, p. 20.

The government has, on the other hand, requested an upward departure and has proposed that the court "impose the maximum custodial sentence permitted by statute (18 U.S.C. 66), ten years incarceration."

Government's Sentencing Memorandum, p. 24.

## DEPARTURE FROM THE SENTENCING RANGE

18 U.S.C. § 3553(b) provides, in pertinent part:

> The court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) [1] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the sentencing commission.

Congress, therefore, left discretion to the sentencing court to depart from the guidelines in extraordinary cases. The Sentencing Commission recognized this discretion, and the limitations inherent in the sentencing guidelines, in a policy statement:

> Circumstances that may warrant departure from the guidelines pursuant to this provision [18 U.S.C. § 3553(b)] cannot, by their very nature, be comprehensively listed and analyzed in advance. The controlling decision as to whether and to what extent departure is warranted can only be made by the courts. ⸺Any case may involve factors in addition to those identified that have not been given adequate consideration by the Commission. Presence of any such factor may warrant departure from the guidelines, under some circumstances, in the discretion of the sentencing court. Similarly, the court may depart from the guidelines, even though the reason for departure is taken into consideration in the guidelines (*e.g.*, as a specific offense characteristic or other adjustment), if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate.

U.S.S.G. § 5K2.0. Thus, although Section 5, Part K of the guidelines manual sets forth various grounds for departure, the Sentencing Commission recognized that it could not possibly set out all potential reasons for departure, and the Court is not limited to those factors in its determination.

■ However, the sentencing court's departure discretion is not unlimited. In this Circuit, a district court's decision to depart upward must satisfy three requirements: (1) the circumstance(s) relied on by the district court must be sufficiently unusual to warrant departure, that is, of a kind or to a degree not adequately taken into consideration by the guidelines; (2) the circumstance(s) relied on by the district court in its decision to depart must actually exist; and (3) the direction and degree of departure must be reasonable. *United States v. Joan*, 883 F.2d 491, 494 (6th Cir.1989) (adopting the test first enunciated in *United States v. Diaz–Villafane*, 874 F.2d 43 (1st Cir.1989)).

■ The first of these requirements, i.e., whether the circumstance relied upon is sufficiently unusual to warrant departure, is a question of law. 883 F.2d at 494. The existence of the circumstance, the second requirement, is a factual determination which may not be set aside absent clear error. *Id.* The last requirement, whether the departure is reasonable in direction and degree,

> "... involves what is quintessentially a judgment call. District courts are in the front lines, sentencing flesh-and-blood defendants. The dynamics of the situation may be difficult to gauge from the antiseptic nature of a sterile paper record. Therefore, appellate review must occur with full awareness of, and respect for, the trier's superior 'feel' for the case. We will not lightly disturb decisions to depart, or not, or related decisions implicating degrees of departure."

---

**1.** 18 U.S.C. § 3553(a)(4) instructs the court to consider the kinds of sentence and sentencing range prescribed by the applicable sentencing guidelines.

883 F.2d at 494, quoting from *United States v. Diaz–Villafane*, 874 F.2d at 49. For those reasons, *Joan* held that:

> Necessarily, the trial judge's determination must be given great deference, and, unless there is little or no basis for the trial court's action in departing, it must be upheld, provided the trial court has recognized that departure is the exception, and has adequately articulated its reasons for departure.

883 F.2d at 496.

We have here a situation in which both parties maintain that there are factors not adequately taken into consideration by the guidelines and which, so it is claimed, justify departure therefrom, either upward or downward.

This court does find a number of factors unique to this case which are not, in the court's estimation, adequately addressed in the guidelines, and which factors will now be addressed and assessed.

## I. DURATION AND REPETITIVENESS OF THE CRIMINAL CONDUCT

■ The guidelines do purport to take into consideration the repetitive nature of criminal offenses committed over a span of time. In fact, in this case, the Probation Officer assessed a two-level increase in the total offense level by reason of a finding that there was "more than minimal planning" of the offenses, under § 2B1.1(b)(5). More than minimal planning is defined as: "more planning than is typical for commission of the offense in a simple form ——" and also is "deemed present in a case involving repeated acts over a period of time——". *See* Application Note 1(f) under § 1B1.1.

Thus, the guidelines do purport to consider the repetitive nature of offenses over time.

Nevertheless, as hereinafter set forth, the court may depart upward if the guideline sentencing range is inadequate in light of the circumstances of the case.

In the court's opinion, the very lengthy duration and extremely repetitive and frequent nature of defendant's acts of embezzlement are factors weighing heavily in favor of an upward departure from the sentencing range.

The criminal conduct involved in the Count Two embezzlement commenced July 11, 1986 and concluded October 13, 1988. *See* Ex. 111–164 and 264.

The criminal conduct involved in the Count Three embezzlement offense commenced July 23, 1982 and continued until December 4, 1989. *See* Ex. 11–108, 110 and 110A.

Thus, defendant's acts of embezzlement, conversion and misapplication of funds covered a period of more than 88 months, or, stated differently, just over seven and one-third years! While the indictment charges that the Count Three offense of embezzlement involved acts committed from March 1986 through December 1989, the evidence at trial established, by a clear preponderance of the evidence, that the acts of embezzlement of public funds perpetrated by drawing checks on the Secret Service Fund of the Detroit Police Department payable to cash, and then causing those checks to be cashed and the proceeds thereof wrongfully converted to the use of persons other than the rightful owners (the citizens of Detroit), and intentionally misapplied, actually commenced July 23, 1982.

The embezzlement offenses in Count Two consisted of 54 different specific instances of the defendant drafting checks payable to various sham corporations or phony business entities created by Kenneth Weiner, none of which payments were for any legitimate police or public purpose, and which checks totaled $1,292,305.00 in money which was in practical effect stolen from the people of the City of Detroit ($299,-500.00 in 1986, $571,325.00 in 1987 and $421,480.00 in 1988).

The embezzlement offenses in Count Three, together with the other items of like embezzlement by the defendant, were committed by drawing checks payable to cash, which checks were then cashed and with the cash being embezzled, stolen, knowingly converted to the use of persons other than the rightful owners (the citizens and

residents of Detroit) and intentionally misapplied. These offenses were perpetrated in this manner in 98 separate instances over a period of seven and one-third years, and involving a total of $1,292,542.49, of which only $237,136.59 was legitimately spent, thereby resulting in a total of $1,055,405.90 in embezzled, stolen, converted and misapplied public funds, all as established by at least a clear preponderance of the evidence.

The funds were taken through the device of the checks payable to cash in amounts during the various years as follows:

| | |
|---|---|
| 1982 | $ 40,500.00 |
| 1983 | 68,340.34 |
| 1984 | 148,000.00 |
| 1985 | 189,000.00 |
| 1986 | 174,210.15 |
| 1987 | 354,292.00 |
| 1988 | 166,700.00 |
| 1989 | 151,500.00 |
| Total | $1,292,542.49 |
| Amount Used for Police Purposes: | − 237,136.59 |
| Amount embezzled, stolen, converted and misapplied, as established by a clear preponderance of the evidence: | $1,055,405.90 |

Thus, in total, combining the embezzlement offenses under Count Two (i.e. the Weiner checks) and the embezzlement offenses of the Count Three variety (the checks drawn to cash, with the proceeds illicitly converted and misapplied) we have a total of 152 separate instances of embezzlement by the defendant by which a total of $2,347,710.90 in public funds was embezzled, stolen, converted and misapplied.

The embezzlements continued as above stated over a period of seven and one-third years and in fact only terminated on December 4, 1989. The defendant was relieved of his responsibilities as administrator of the Secret Service Fund on Decem-

ber 5, 1989, in the midst of an investigation of the handling of the fund. The last check to cash, in the amount of $10,000.00, was issued on December 4, and was cashed on December 5, the very day on which his control of the fund was terminated.

The repetitive nature and duration of the criminal activity is even more shocking upon examination of the specific transactions. For instance, from April 9, 1985 to April 12, 1985 three separate checks to cash were issued, in amounts of $20,000.00, $20,000.00 and $25,000.00 respectively, or a total of $65,000.00 in four days.

—On July 6, 1987 two separate checks were issued to cash in the amounts of $18,000.00 and $17,000.00, being a total of $35,000.00 in one day!

—On December 7, 1987 a $15,000.00 check was drawn to cash, followed by another $17,500.00 check on December 9, 1987, or $32,500.00 in three days!

—On March 17, 1987 a $20,000.00 check was drawn to cash, followed by a $20,000.00 check on March 23, 1987, and an $18,000.00 check on March 26, 1987, being a total of $58,000.00 over a nine day period!

The record is replete with similar instances of check after check, for staggering amounts, being drawn payable to cash, over brief periods of time, with no supporting documentation, and usually with a reference to a non-existent phantom "covert operation 82–1".

Although the guidelines purport to consider the repetitive nature of offenses over time,[2] the Court may nonetheless depart upward if the guideline is not adequate in light of the circumstances of the case. *United States v. Burns,* 893 F.2d 1343 (D.C.Cir.1990), *reversed on other grounds,* —— U.S. ——, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991);[3] *United States v.*

---

**2.** The Probation Department assessed a two-level increase for "more than minimal planning" under § 2B1.1(b)(5), which is defined as "more planning than is typical for commission of the offense in a simple form ..." and is also "deemed present in a case involving repeated acts over a period of time ..." *See* Application Note 1(f) under § 1B1.1.

**3.** The Supreme Court reversed because the defendant had no notice of the court's intention to depart upwards *sua sponte* prior to sentence. The Court did not address any other issue involving the propriety of the upward departure. —— U.S. at ——–——, 111 S.Ct. at 2187–2188.

*Benskin,* 926 F.2d 562 (6th Cir.1991). Thus, in *Burns,* the court upheld a 23 month departure from a maximum guideline sentencing range of 37 months based, in part, on the fact that the guidelines:

> ... do not give sufficient weight to the duration of the crime. Because the Defendant's fraudulent scheme persisted for six years and involved 53 separate instances, the judge concluded that departure from the guidelines was warranted.

893 F.2d at 1345. In addressing the appellant's argument that the guidelines already accounted for the duration and repetitive nature of the crime in the § 2B1.1 enhancement for "more than minimal planning," the court noted:

> The trial court, however, specifically stated that her decision to enhance Burns' sentence was based, not simply on planning, but upon the prolonged and repetitive nature of Burns' crime ... The court properly observed that in incorporating a "more than minimal planning" adjustment into the guidelines, the Commission did not consider "the number of years and the amount of fraudulent transactions ... executed" by a defendant. Burns' crime involved 53 separate acts of theft over a six-year period. The trial judge could reasonably have concluded that the duration of *execution,* then, warranted enhancement. We note that a defendant who persists in his criminal activity over a period of years may deserve a harsher sentence than a defendant whose crime was limited in duration because the former has arguably had more opportunities to renounce his illegal schemes. Accordingly, the trial courts finding that the duration of Burns' crimes justified departure, was not dependent upon the amount of planning involved in the crime, and thus was not unreasonable.

(emphasis in original) 893 F.2d at 1346. *See also: United States v. Benskin,* 926 F.2d at 567 (upholding upward departure to 60 months, from a sentencing range of 27–33 months, based, in part, on the duration (4½ years) of the offense, citing *Burns, supra,* with approval).

The duration of the crimes charged in Counts Two and Three here clearly justifies an upward departure from the sentencing range.

As *Burns, supra,* recognized, the guidelines did not contemplate, in their § 2B1.1 upward adjustment for "more than minimal planning," offenses of such duration and repetitive character. In this case, the duration and repetitive nature of the offenses exist independent of the amount of planning involved and "... to a degree not adequately taken into consideration by the guidelines" 18 U.S.C. § 3553(b).

In the court's opinion, an upward departure from the sentencing range under the guidelines is justified and warranted on this basis alone.

## II. DEFENDANT'S UNIQUE RESPONSIBILITIES TO THE PUBLIC AS CHIEF OF THE DETROIT POLICE DEPARTMENT

■ The defendant served as Chief of the Detroit Police Department, the sixth largest in the United States, from September 28, 1976 until the date of his indictment, and was a member of that police department for only one week short of 40 years, having resigned the day following his conviction for these four felony offenses.

The power and authority which he exercised by virtue of his position as Chief of Police in this large metropolitan area, and the concomitant vitally important responsibilities and duties assigned to him and expected of him by the residents of the City of Detroit, certainly sharply distinguish his case and his situation from "typical" cases of this sort contemplated by the sentencing guidelines.

It is of course true that the guidelines do increase the offense level in this case for "abuse of positions of trust" (U.S.S.C. § 3B1.3) but mere reliance on that factor certainly would fail to address the history of defendant's abuse and exploitation of his power and authority over this major metropolitan police force.

Such a blind reliance on the aforesaid two-level enhancement of the total offense level for "abuse of position of trust" would, in the circumstances of this defendant's position, seem to, in a sense, trivialize the gravity of the criminal conduct in which he engaged. Chief Hart had taken an oath to uphold and enforce the law, and he instead descended to a corrupt course of conduct in which he engaged for over seven years, and which involved act after act of criminal conduct.

The trust bestowed upon this defendant by virtue of his position was the trust of approximately one million residents of the City of Detroit, who had the absolute right to expect that the conduct of their Chief of Police would be above reproach, that he would be a model of rectitude, that he would enforce the laws and would, needless to say, himself punctiliously and scrupulously obey those laws. Instead, the defendant became a criminal, abused his authority, violated his office, exhibited contempt for the trust placed in him and looted the Secret Service Fund of the Detroit Police Department of more than $2,300,000.00.

He exploited the power and authority which he held by virtue of his command position by directing police officers who served under him to unwittingly facilitate and implement his embezzlement scheme, and to assist him by following his orders to draw the illicit checks, to prepare false documentation thereof, to cash those checks and to then return the cash to him. He exercised such control, and received such unquestioning obedience from even his closest and most high-ranking subordinates, that they complied with his requests without outward expressions of any reluctance or reservation whatsoever even though his handling of this Secret Service Fund egregiously violated the practices, procedures and policies of the Detroit Police Department and the City of Detroit.

The defendant is a man sworn to uphold and enforce the law, who instead chose to betray his oath and violate, in the most reprehensible manner, the trust placed in him by the people of this city.

This is, fortunately, a rare and unique case. While police officers are sometimes, sad to say, found to be corrupt, only rarely is a police chief, especially of a major metropolitan city, found to be a criminal, and even more rare is the instance of a command officer of a large metropolitan police department being guilty of corruption of the magnitude involved in this case.

To equate Chief Hart's violation of the public trust of the people of Detroit with that of the ordinary run-of-the-mill embezzler would constitute a travesty and a mockery of our system of criminal justice.

It may rhetorically be asked, if the people cannot trust their preeminent law enforcement officials to enforce and obey the laws, then where can the public's trust and reliance be placed? This case manifestly involves an "abuse of a position of trust" which is so heinous as to be immeasurably and inordinately beyond that contemplated by the sentencing guidelines.

To suggest that U.S.S.G. § 3B1.3 adequately takes into account Defendant's position as chief of police is to equate this with an ordinary low-ranking corporate, business or public officer, such as e.g. a postal clerk, who takes advantage of his or her limited position of trust to embezzle or misapply funds. To equate defendant's conduct and situation and position with such common embezzlers would be indeed a travesty.

The defendant's criminal conduct in this matter, in light of his unique position of authority and the power vested in him thereby, and the callous disregard by him of his oath and his responsibilities to the people, warrant an upward departure.

## III. DEFENDANT'S EFFORTS TO CONCEAL HIS CRIMES

It is the court's opinion that the sentencing guidelines do not adequately address defendant's use of efforts of an extraordinary nature to conceal his criminal behavior and to prevent its detection.

U.S.S.G. § 5K2.9 provides that "(i)f the defendant committed the offense in order to conceal the commission of another offense, the court may increase the sentence

above the guideline range—". These crimes were not committed by defendant in order to conceal other crimes, so this section is inapplicable.

The Commentary to § 1B1.1 does state, in Application Note 1(f) that "(m)ore than minimal planning also exists if significant affirmative steps were taken to conceal the offense, other than conduct to which § 3C1.1 (Obstructing or Impeding the Administration of Justice) applies." The Probation Department has, of course, assessed a two level increase to the base offense level for "more than minimal planning" of the offense, pursuant to § 2B1.1(b)(5), (see paragraph 49 of the Presentence Report) and the court has previously overruled defendant's objection to that two-level increase, which was defendant's objection No. 30. (§ 2B1.1(b)(5) provides that "(i)f the offense involved more than minimal planning, increase by two levels", and Application Note 1 thereunder provides that "(m)ore than minimal planning (is) defined in the Commentary to § 1B1.1 (Application Instructions)") which would be Application Note 1(f) to which reference is made above.

The question is, then, whether defendant's efforts to conceal these offenses are adequately covered by the "more than minimal planning" two level increase to the base offense level. It is the court's conclusion that the guidelines, as applied herein, do not adequately take into consideration defendant's conduct in attempting to conceal his crimes. It is clear beyond question that "more than minimal planning" existed irrespective of defendant's efforts to conceal his conduct, merely by the procedure necessarily followed by him in cashing the many checks over a period of more than seven years and in drawing many other checks to sham corporations created by Kenneth Weiner. It would seem that any sort of an embezzlement scheme would necessarily involve more than minimal planning and efforts at concealment. To assume that the two-level offense level increase under § 2B1.1(b)(5) adequately addresses defendant's concealment efforts in this case would be to disregard the extraordinary nature, and exceptionally devious undertakings of defendant in his attempts to conceal his unlawful conduct and to escape detection, which iniquitous efforts and tactics were successful for more than seven years. "More than minimal planning" was established in this case by the presence of "more planning than is typical for commission of the offense in a simple form" (Application Note 1(f) to § 1B1.1) irrespective of any efforts at concealment. Thus, since these offenses clearly did involve "more than minimal planning", to include defendant's efforts at concealment of his crimes within the "more than minimal planning" two-level increase in the base offense level would be to ignore defendant's culpable action in concealing and camouflaging his crimes. Accordingly, since "more than minimal planning" existed in the acts of embezzlement themselves, considering the acts of concealment of the embezzlements as the basis for a departure from the sentencing range under the sentencing guidelines would not constitute double punishment. The rationale is the same as that utilized by the court in *United States v. Burns*, 893 F.2d 1343, 1346 (D.C.Cir.1990), and quoted herein at pp. 58–59. In *Burns* the Court determined that even though the guidelines provided for an enhancement for "more than minimal planning" under § 2B1.1(b)(5), and that the duration and repetitive nature of the offense could constitute "more than minimal planning" (Application Note 1(f) to § 1B1.1), nevertheless where more than minimal planning was present in any event, this did not negate the trial court's determination that the lengthy duration (six years) and large number (53) of fraudulent transactions warranted an upward departure from the sentencing range under the guidelines. The same reasoning is, in the court's estimation herein, applicable to the defendant's many acts of concealment of his criminal behavior, which occurred in addition to the fact that his embezzlement scheme necessarily involved, even without those acts, "more than minimal planning." It is this court's finding that defendant's efforts to conceal his offenses were truly remarkable and extraordinary.

(The government has accurately set forth in its sentencing memorandum a list any of many of the measures undertaken by defendant to conceal his criminal conduct and this court has therefore elected to quote extensively therefrom.)

The defendant relied on the confidential nature of the Secret Service Fund to facilitate the offenses and to thwart their detection. His efforts to conceal went far beyond the passive exploitation of the fund's legitimate need for confidentiality. The Defendant, from the outset of the crimes, routinely made false statements concerning the use of the checks made payable to cash, and the use of those issued to Weiner's sham companies. He lied to, among others, the City's Finance Department,[4] the Auditor–General,[5] the Detroit City Council[6] and various officers of the Detroit Police Department.[7]

Moreover, the Defendant sought and received the services of William Wolfson, Deputy Corporate Counsel for the City of Detroit, to represent him in negotiations with the Auditor–General for the purpose of preventing the disclosure of information pertaining to those checks in the course of an audit. During those negotiations, the Defendant repeatedly asserted that such disclosure would jeopardize the lives of police officers and innocent civilians. It is now clear, of course, that disclosure threatened nothing other than the Defendant's ability to continue his misappropriation of money from the Secret Service Fund and his position as the Chief of Police.

Mr. Wolfson's services led to an agreement with Roger Short, the Auditor–General, concerning the audit of the Secret Service Fund.[8] That agreement gave the Defendant the power to "defer" the disclosure of documentation evidencing expenditures from the Secret Service Fund for two years after adjudication or internal termination of cases utilizing such funds. Mr. Short entered into this agreement in good faith reliance on the Defendant's representations that earlier disclosure of such information would jeopardize lives and police operations, and that the records would ultimately be made available. However, the Defendant never intended to release such information at any time. He told Mr. Wolfson, prior to the agreement, that various covert operations might *never* be closed, and therefore, underlying documentation might *never* be revealed to the Auditor–General.

Thus, the Defendant, by virtue of his false statements and misrepresentations, obtained the power and discretion to effectively prevent the audit of any expenditures from the Secret Service Fund which he deemed "sensitive."

The Defendant wasted no time in invoking the agreement. Less than ninety days after its execution, as evidenced by Exhibit 330, the Defendant proclaimed a sample of documents requested by the Auditor–General, which included large checks payable to cash and to the Weiner companies, off limits to Mr. Short, based on his "conclusion" that disclosure would jeopardize secu-

---

4. Exhibits 7 through 7–D contain some 58 letters from the Defendant to Finance Department officers concerning requests for replenishment of the Secret Service Fund, indicating that each request "conforms with the guidelines established by the finance director" and that, "due to the sensitive nature of the operations ... documentation for this account is maintained in my office." As the Court now knows, the Defendant did not conform to Finance Department directives and no documentation existed evidencing the disbursement of the proceeds of checks issued to cash or to Weiner.

5. *See, e.g.:* Exhibits 314 (the Defendant assures the Auditor–General that the Secret Service Fund is used in the manner originally intended), 315 and 316 (the Defendant agrees to abide by the Auditor–General's recommendations re-

garding notification to the Purchasing Director of specified expenditures), and 330 (indicating that certain checks to cash and to Weiner's companies involved "open operations," the disclosure of which would "jeopardize security and undermine the viability of these ongoing covert operations.")

6. *See* Exhibit 333–A, a letter from the Defendant to the City Council asserting that the disclosure of requested information (i.e., the documentation underlying the checks at issue in this case) would jeopardize the lives of police officers and citizens.

7. See memoranda accompanying checks to cash and to the Weiner entities.

8. Exhibit 329.

rity and the viability of "covert operations." Of course, no such "covert operations" existed relating to the checks to cash and to Weiner's company.

This defendant thus exercised his considerable power and influence to circumvent the system of accountability established by the city charter, local ordinances and Finance Department directives relative to the administration of the Secret Service Fund. He routinely lied to his own officers in order to make illegitimate expenditures appear legitimate. He routinely lied to the finance department in order to receive reimbursement for the monies he misappropriated. When the Auditor–General demanded, pursuant to the City Charter, to audit a small sample of expenditures, he lied again. He used a city attorney to negotiate a specious agreement with the Auditor–General—an agreement which ceded to the Chief of Police the absolute authority and discretion to determine if and when information vital to the audit process would be disclosed. He then invoked that agreement to insure that his crimes would not be detected, falsely asserting that lives would be jeopardized by disclosing the purpose of the questioned expenditures.

On January 23, 1991 defendant, in the company of his then-attorney, presented to F.B.I. Special Agent Dawn Moritz, to an agent of the I.R.S. and to Assistant United States Attorneys a document which he had prepared and which he represented as an explanation of the various Secret Service Fund checks to cash from 1982 to 1989 and which, so he purported, showed the expenditures to have been for legitimate law enforcement purposes.

The defendant, by means of this document, attempted to mislead investigators by falsely informing them that the missing and unaccounted for funds from the Secret Service Fund had in actuality been expended, by means of checks written to cash, for legitimate police business and law enforcement activities, in a "Covert Operation 82–1" which expenditures, according to the document, totalled $1,203,140.00 for the period 1982–1989, a figure which is amazingly close to the amount of the checks to cash

established under Count Three, i.e. checks drawn payable to cash, in the total amount of $1,292,542.49 from which $237,136.59 was actually spent on legitimate police business thereby leaving $1,055,405.90 as, so this court has determined, the amount of the Count Three embezzlement.

In other words, if the document (Ex. 192) had not been false and misleading, it would have been a virtually complete explanation of the uses to which the missing cash had been put. In actuality, however, "Covert Operation 82–1" did not exist, as the proofs clearly established. There was not a single record or document to even hint that its existence was other than a total fabrication. In the document, which constituted a palpable attempt by defendant to mislead investigators and conceal his crimes, he set forth the following as activities pursued under non-existent "covert operation 82–1":

—investigation of Young Boys Inc., a drug gang
—identification of leadership and members of youth gangs
—security of Mayor Young's residence and office
—investigation of executive police criminal activity
—investigation of fatal shooting of Police Officer William Green
—Narcotics Drug Organization intelligence gathering
—planning and security for the International Chiefs of Police Convention
—breaking and entering of private dwellings and criminal sexual conduct on northwest side of Detroit
—conduct of "Sting Operations" and development of Sources of Information for intelligence relative to major crimes
—police corruption case involving Deputy Chief George Bennett and Lieutenant John George
—police residency investigations
—visits of 1984 Presidential candidates
—investigation of complaint of James Spivey et al re: harassment by Warren Police Department
—planning and security for Pope John Paul's visit to Detroit

**64**

—planning and security for Archbishop Desmond Tutu's visit to Detroit

—internal affairs investigation of police corruption, conspiracy and murder involving Police Officers Myron Wahls, Burt Lancaster and Derrick Henry, Bruce Williams, Larry Bradford et al.

—investigation of police corruption in a suspected narcotics case involving Commander Gilbert Hill, Sergeant James Harris, Cathy Volson–Curry and the John Curry drug distribution organization

—investigation of suspected drug use and criminal activity by police personnel

—protection of witnesses against "Best Friends" murder for hire organization

—investigation of threats against members of family of Mayor Young

—protection of Colombian judge

—cooperative covert operation between Detroit Police Department and U.S. Alcohol, Tobacco & Firearms Agency to identify sale of illegal weapons and explosives to drug distribution operations and known contract murderers.

Clear and convincing evidence established that the explanations given by the defendant to the investigators, and the documentation which he furnished to them in an attempt to explain and justify the fact that vast sums of cash were missing and unaccounted for, were misleading and were substantially false and fabricated.

Witness after witness testified at trial that in fact the costs of these activities were not incurred by the Secret Service Fund and were certainly not borne by drawing checks to cash, cashing such checks and then making payments covering such matters in cash. At least a preponderance of the evidence clearly established that the costs of these activities primarily involved payment of overtime wages to police personnel, which payments were made by check from the regular police department payroll account, and from regularly budgeted funds. To suggest that police overtime wages to provide security for Pope John Paul and various presidential candidates were paid in cash to the officers, without any accounting thereof or payroll deductions therefrom and with the cash coming from checks drawn payable to cash in multi-thousand dollar amounts, is truly ludicrous.

The clear preponderance of the evidence, and indeed clear and convincing evidence, established that there was no "covert operation 82–1", that the expenses of the operations and activities listed by defendant in Exhibit 192 were not paid with proceeds of the checks drawn payable to cash from the Secret Service Fund, that the document was misleading, deceptive and spurious and that it was prepared by defendant and presented by him to investigators in an attempt to delude them. This was thus additional evidence establishing the dissembling and concealment by defendant of his criminal acts.

Thus, there has been an intensive and protracted series of actions taken by defendant to dissemble, to mislead and to falsify, all to conceal his criminal conduct, and to avoid the consequences of his flagrant and pervasive unlawful actions.

These actions are entirely separate from his acts constituting obstruction of justice, which involved his conduct in persuading Andrea Henry, his mistress, to testify falsely before a federal grand jury which was investigating these matters. The base offense level herein has previously been enhanced by two levels by reason of defendant's improper actions with regard to Ms. Henry's grand jury testimony, which were established by at least a preponderance of the evidence, and in the court's opinion by clear and convincing evidence. See ¶ 52 of the Presentence Report, Defendant's Objection No. 31 to No. 52 and this court's Ruling on Defendant's Objection No. 31, as hereinbefore filed.

In short, the defendant subverted and effectively eliminated and destroyed the limited accountability which existed relative to the Secret Service Fund in order to conceal and continue his criminal behavior. The guidelines do not contemplate such circumstances. Departure from the sentencing range is warranted on this basis alone.

## IV. PUBLIC TRUST IN THE RECTITUDE OF THE DETROIT POLICE DEPARTMENT

■ In this case, by far the most significant factor in determining the appropriate sentencing range under the sentencing guidelines is the amount of loss suffered by the victims of defendant's offenses, who were of course the people of the City of Detroit. See U.S.S.G. § 2B1.1 relating to embezzlement and § 2F1.1 relating to fraud. In this matter, of the total offense level of 24, as calculated by the Probation Department, four levels are attributable to the base offense level and 14 to the amount of loss involved.

The following language is found in Application Note 7(a) to § 2F1.1 relating to offenses involving fraud and deceit and would seem, as found by the court in *United States v. Fousek, infra,* to be equally applicable to embezzlement, which by its very nature involves fraud and deceit:

> In some cases the loss determined above may significantly understate or overstate the seriousness of the defendant's conduct.

Application Note 10 of the Commentary to § 2F1.1 provides that:

> In cases in which the loss determined under subsection (b)(1) does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted. Examples may include the following:
> (e) *the offense caused a loss of confidence in an important institution*

(emphasis added).

It is clear that the Sentencing Commission recognized that in certain situations, in which the crime did involve fraud and deceit, which defendant's crimes certainly did involve, loss of confidence in an important institution is reason for an upward departure.

It is difficult to imagine or to contemplate any situation more fraught with the risk and reality of loss of confidence in a public institution than the inevitable adverse effect upon the public's perception resulting from revelation that their Chief of Police is corrupt and has embezzled, stolen, converted and misapplied millions of dollars of the public's money which was intended to have been used in the fight against crime and criminals. To have the Chief of Police exposed as a criminal himself who misused the public's money must inevitably have a devastatingly negative effect on the public's confidence and trust in the very police department upon which they must rely for protection from the lawless element in our society.

■ The damaging effect of an offense on the public's confidence in an important public institution is a recognized basis for departure. *United States v. Fousek,* 912 F.2d 979 (8th Cir.1990). In *Fousek* the court upheld a sentence twice the length of the applicable maximum of the sentencing range under the guidelines, where the defendant, a bankruptcy trustee, had pleaded guilty to embezzlement from funds he had held as trustee. The court based its ruling on Application Note 9 of the Commentary to § 2F1.1 of the guidelines, which at that time provided:

> 9. Dollar loss often does not fully capture the harmfulness and seriousness of the conduct. In such instances an upward departure may be warranted. Examples may include the following:
> (e) the loss caused a loss of confidence in an important institution.

At present, similar language is found in Application Note 10, as quoted supra.

The court in *Fousek* noted that the guidelines thus specifically authorized an upward departure under circumstances in which the offense "caused a loss of confidence in an important institution."

In *Fousek,* the defendant argued that an upward departure under the above cited Commentary to § 2F1.1 was not warranted since there was no evidence before the court that there had been, as a result of his misconduct, a loss of confidence in the bankruptcy trustee system. The court held however that no such evidence was required in a case of embezzlement by a bankruptcy trustee, and the court in effect took judicial notice of the fact that such a loss of confidence in an important public

institution, the bankruptcy trustee system, would necessarily and inevitably result from defendant's embezzlement offense:

> Fousek contends that the district court erred in considering the impact of Fousek's crime upon the integrity of the institution of bankruptcy trustee because there was no evidence before the court that there had been a loss of confidence in the bankruptcy trustee system. We conclude that no such evidence was necessary, for when a person in a position of public trust ... embezzles money from those he is bound to aid, it stands to reason that there will be some resulting loss of confidence in that institution.

912 F.2d at 981.

The court in *Fousek*, at 980, also utilized and applied the provisions of the Application Notes of the Commentary to § 2F1.1, dealing with crimes involving fraud and deceit, to Fousek's situation in which he was charged with embezzlement, which is generally governed by § 2B1.1 and the Commentary thereunder. This is entirely appropriate, since embezzlement is of course an offense which inevitably involves fraud and deceit.

The court in *Fousek*, at 980, ruled that the Sentencing Commission through its guidelines, policy statements and official commentary had not taken into account the unique and atypical situation of a bankruptcy trustee embezzling estate funds, and that Fousek's situation not being contemplated under the guidelines, an upward departure was warranted under 18 U.S.C. § 3553(b).

The Defendant here was the Chief of the Detroit Police Department for more than fourteen years, and employed by that department for almost forty years. The revelation of his corruption clearly caused shock, dismay and distress to the community. The evidence establishing the offenses was widely reported on a daily basis during the course of the trial. His convictions could not help but be devastating to the

public's confidence in an already overburdened police department—a police department struggling to provide basic services to his community, a community which is beset by the depredations of criminals and in which the police department every day must cope with a multitude of criminals preying upon the good and honest citizens of Detroit.

The Defendant's convictions, and the evidence on which they were based, revealed serious problems in the administration and accountability of the Detroit Police Department. Much of the evidence was clearly embarrassing, not only to the Defendant, but to the command structure of the department and the thousands of concerned, honest men and women who have striven to honorably, courageously and diligently serve the citizens they have sworn to protect.[9] There is, of course, no way to evaluate the extent of the damage done by the Defendant to the reputation of, and public confidence in, the Detroit Police Department. But, it cannot conceivably be denied that such harm was a real and significant and absolutely inevitable consequence of this Defendant's offenses.

## V. MISAPPLICATION OF FINANCIAL RESOURCES OF CITY OF DETROIT FROM LAW ENFORCEMENT ACTIVITIES

█ This case involves the diversion of over $2,300,000.00, and the time and efforts of police personnel, from the primary functions of the police department, i.e., the protection of the public, the enforcement of the laws, and the apprehension of lawbreakers. It is not possible to evaluate, in specific terms, the damage done by defendant through his diversion of funds and personnel during his years of criminal conduct, but needless to say, it must have been profound.

Not only did the defendant misapply, convert and embezzle funds, and engage in

---

**9.** Aside from the evidence of the misapplication, conversion, embezzlement and deception by the Chief of Police, other facts emerging at trial, such as his dedication of scarce department resources to security for the Mayor and his

relatives, and to the personal business of the Chief himself, could not help but undermine and tarnish further the image of the Detroit Police Department.

a course of fraud and deception, evidence at trial also established that he diverted police personnel from their responsibilities to the public in order to provide inordinate security to the mayor and his relatives, and to assist the Chief himself in his own personal business and affairs. The effect of these diversions of money and personnel from their proper purposes and activities must necessarily have had an adverse effect on the police department's ability to prevent, detect, investigate and prosecute criminals and to apprehend malefactors.

The City of Detroit is a tortured city. It is at times almost under a state of siege by criminals, who have in many instances utterly no regard for human life, and who prey upon the good citizens of the community and devastate and destroy their neighborhoods.

In the face of that situation this defendant, the top law enforcement officer of the City of Detroit, elected to use the Secret Service Fund, a fund dedicated by the people's representatives to be used to fight organized crime, to combat the narcotics traffickers whose operations are a cancer on the residential neighborhoods of Detroit, and to conduct undercover operations so vitally necessary to effective law enforcement, for his own corrupt purposes. Such conduct was more than reprehensible. It was absolutely shameful. The defendant took from the people of Detroit, so many of whom are poor and sadly in need themselves, the public funds which were intended to be used for their protection and for improvement of the quality of their lives in a beleaguered city.

It should be emphasized that this is not a case where the corruptly diverted resources were dedicated for the purpose of payment of such relatively trivial things as travel expenses of federal employees, as in *Burns*, supra, or Chapter 13 creditors, as in *Fousek*, supra. Rather, these funds were committed to making the streets, the neighborhoods and the residents of the City of Detroit safer through the apprehension of criminals and their removal from the community. Thus, the circumstances of the defendant's crimes are patently more

wicked than the offenses of *Burns* and *Fousek*, who nevertheless were assessed sentences more severe than provided under the Guidelines. (In *Fousek*, supra, the sentence was twice the maximum under the Guidelines, being 36 months whereas the guidelines called for a maximum of 18 months. In *Burns*, supra, the sentence was 60 months, wherein the guidelines called for a maximum of 37 months, being an increase of 62%).

▮ The sentencing guidelines specifically provide that:

> If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected ...

U.S.S.G. § 5K2.7. The Sentencing Commission, in another policy statement, clarified the circumstances in which a departure under § 5K2.7 would be appropriate:

> Where the applicable guidelines, specific offense characteristics and adjustments do take into consideration a factor listed in this part [Part K—Departures], departure from the guidelines is warranted only if the factor is present to a degree substantially in excess of that which is ordinarily involved in the offense of conviction. Thus, disruption of a governmental function, § 5K2.7, would have to be quite serious in order to warrant departure from the guidelines when the offense of conviction is bribery or obstruction of justice. *When the offense of conviction is theft, however, and when the theft caused a disruption of a governmental function, departure from the applicable guideline more readily would be appropriate* ...

(emphasis added) U.S.S.G. § 5K2.0, ¶ 2. Thus, where a theft offense results in a significant disruption of a governmental function, upward departure is warranted.

In *United States v. Burns*, supra, the court relied on these policy statements to uphold an upward departure based, in part, on the disruption of a governmental function occasioned by the defendant's embez-

zlement of federal funds under circumstances similar to this case:

> Burns was employed by the U.S. Agency for International Development ... Beginning in February 1982, he used his position as a supervisor in the agency's Financial Management Section to authorize the payment of unused travel funds from the U.S. Treasury to Vincent Kaufman. However, the payments to Kaufman were really a front for diverting governmental funds to Burns' own pocket. From 1982 to 1988, Burns authorized the issuance of 53 checks totaling in excess of $1,200,000.

893 F.2d at 1344. The court found these circumstances fully deserving of departure:

> The guidelines contemplate departure for crimes which significantly disrupt the function of government. We reject Burns' argument that this was not an appropriate case for such departure. The fact that Burns' crimes went undetected for so long does not indicate that his activities caused little disruption. Rather, the record indicates that he diverted government resources and used federal mechanisms to perpetrate his crimes. Such misuse of the government's vendor payment process is clearly disruptive; *it diverts federal resources from legitimate to illegitimate recipients.*

> \* \* \* \* \* \*

> Burns' manipulation of AID procurement apparatus required the unwitting assistance of many governmental personnel, who were diverted from their legitimate tasks by the demands of the scheme. The record demonstrates that Burns *relied upon clerks to prepare forms necessary to divert government funds, and that his checks to "Vincent Kaufman"—issued by the United States Treasury—required administrative resources: including the time and personnel to process these checks.*

(emphasis added) 893 F.2d at 1347.

The Defendant here similarly utilized the scarce resources of a governmental agency, the Detroit Police Department, to commit his crimes. He obtained the unwitting assistance of various members of the Chief's Staff Division to prepare the form memoranda ordering the checks, the checks themselves, and to secure other authorized signatures on the checks from signers who had no knowledge of their purpose. He used his administrative sergeant to personally deliver some of the checks to his residence. He used a department command officer, Joel Gilliam, to convert the checks to cash, calling him away from his assignments in other divisions to do so. He even enlisted the help of a city attorney to prevent the discovery of the offenses, as discussed above. In this case, the disruption of a governmental function was far more substantial than that forming the basis for departure in *Burns.*

Most importantly, the Defendant's offenses diverted scarce resources—money specifically earmarked for use in the fight against violent and narcotics related crime in the City of Detroit—from legitimate law enforcement activities and into the pockets of Kenneth Weiner and William Hart. There can be no dispute that the primary governmental function of the Detroit Police Department is the protection of the citizens of this community through the prevention, investigation and prosecution of criminal activities in the City of Detroit. Every dollar devoted to that function is precious in a community as heavily beset by violent crime as Detroit.

During the second half of the 1980's, when the Defendant was diverting literally hundreds of thousands of dollars to Kenneth Weiner to help support his lavish lifestyle and obtaining a like amount in cash for his own purposes, the testimony at trial revealed that Secret Service Fund sub-accounts for major sections and divisions of the Detroit Police Department had to wait, sometimes for months, to be reimbursed for their legitimate expenditures. One narcotics officer testified that money was sometimes so scarce that the officers had to use their personal funds to make narcotics purchases on the streets of the city.

Like the damage the Defendant inflicted on the reputation of, and public confidence in, the Detroit Police Department, the ef-

fect of diverting its personnel and over $2,300,000 away from legitimate law enforcement activities cannot be quantified. It is eminently reasonable to infer, however, that such a diversion had a significant and negative impact on the fight against crime, and, therefore, on the quality of life of all of the residents of the City of Detroit.

The dismal, monstrous and intolerable consequences of defendant's outrageous and heinous misconduct in the embezzlement of funds which had been dedicated by the people's elected representatives to the war against crime and criminals cannot be overestimated.

Those consequences, under the circumstances here presented, are so cruel and hurtful to the residents of this community that they alone warrant an upward departure in the sentence.

## VI. REASONABLENESS OF AN UPWARD DEPARTURE

 The reasonableness of the degree of departure from the sentencing range under the guidelines is basically a matter of the court's exercise of judgment and discretion. As has been said, the matter of the extent or degree of such a departure "—involves what is quintessentially a judgment call." *United States v. Joan*, supra, at 494.

 The fact that a sentence may exceed, even by several times, the maximum prescribed by the guidelines "—is of no independent consequence in determining whether the sentence is reasonable." *United States v. Roberson*, 872 F.2d 597, 606, fn. 7 (5th Cir.1989) Appellate courts have in fact affirmed upward departures of many times the maximum guideline sentence. *Roberson, Id.*, citing *United States v. Juarez–Ortega*, 866 F.2d 747 (5th Cir. 1989) (four times the guideline maximum); *United States v. Guerrero*, 863 F.2d 245 (2d Cir.1988) (more than five times the guideline maximum); *United States v. Correa–Vargas*, 860 F.2d 35 (2d Cir.1988) (more than four times the guideline maximum); *United States v. Nuno–Huizar*, 863

F.2d 36 (9th Cir.1988) (more than three times the guideline maximum).

See also *United States v. Joan*, supra (sentence of 120 months, maximum guideline range 71 months); *United States v. Benskin* (sentence of 60 months, maximum guideline range 33 months); *United States v. Fousek*, supra (sentence of 36 months, maximum guideline range 18 months), in which the upward departures were approved for far less compelling reasons than exist in this case.

 This court has determined that there are five factors present in this case, any one of which warrants an upward departure from the sentencing range under the guidelines. In this case the extreme duration and repetitive nature of these offenses, the violation by the defendant of his unique responsibilities to the public as Chief of the Detroit Police Department and his betrayal of the public, the flagrant and devious efforts which he made to conceal his crimes, the loss of confidence in the Detroit Police Department which he caused by his shameful and shocking misconduct, and the egregious and intolerable harm caused by his misapplication of millions of dollars of funds of the City of Detroit which were to be used to combat crime, do justify an upward departure to the maximum sentence under 18 U.S.C. § 666, being 10 years incarceration.

## DEFENDANT'S REQUEST FOR DOWNWARD DEPARTURE

 Defendant's counsel urges, in support of his request for a downward departure, that defendant's long years of honorable service to the Detroit Police Department, his community service and involvement and awards, his personal history and background, his age (67) and his devotion to his family be considered. The court has considered all these matters. They do not, in the court's view, provide any justification for a downward departure in defendant's sentence, in view of the nature and the effects of defendant's criminal conduct, and his utter disregard of the responsibilities of the high position which he held.

Neither are any of these attributes sufficient to persuade the court that there should not be an upward departure. To the contrary, the court finds that there are five categories of circumstances herein as above detailed, any one of which warrants an upward departure and which considered in conjunction are compelling indeed.

## SUMMARY

This court finds that there exist aggravating circumstances of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the sentencing guidelines that should therefore result in a sentence different from that described in the guidelines. Those aggravating circumstances are in the five categories hereinabove again listed and discussed at length herein.

In making this determination that those five categories of circumstances herein were not adequately taken into consideration by the Sentencing Commission, this court has considered only the sentencing guidelines, policy statements and official commentary of the Sentencing Commission.

The court has therefore determined, pursuant to 18 U.S.C. § 3553(a) and (b) and U.S.S.G. § 5K2.9, that an upward departure to a sentence of incarceration of ten years is warranted and justified.

This court has further determined that a downward departure herein is neither warranted nor justified.